IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TYRONE OWENS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )  Case No. 14–cv–1421–MJR–SCW |
| | ) |
| CURTIS EBERS, | ) |
| MICHAEL HELLMAN, and | ) |
| THOMAS SPILLER | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |

## <u>REPORT AND RECOMMENDATION</u>

**WILLIAMS, Magistrate Judge:**

*Pro se* Plaintiff Tyrone Owens, currently incarcerated at Pickneyville Correctional Center, filed this case on December 29, 2014, alleging a plethora of unconstitutional conduct against numerous defendants across a span of several years and at two separate institutions. (Doc. 1). The Court found fault with Plaintiff's original Complaint (it was not signed) and directed him to file an amended complaint, which Plaintiff successfully filed (after more procedural wrangling) on February 17, 2015. (Doc. 22). That Complaint underwent threshold review on March 11, 2015. (Doc. 28). The Court found that Plaintiff had stated two claims: 1) Defendant Eber prevented Plaintiff from speaking with his assigned wing officer on December 26, 2014 by yelling loudly at Plaintiff in a disrespectful and threatening manner, in violation of the First and Eighth Amendments; and 2) Hellmann and Eber conspired to retaliate against Plaintiff for reporting an alleged staff assault by referring to Plaintiff as a "snitch" in the presence of other inmates on his wing (which resulted in two assaults within twenty-four hours) and placing contraband in his cell on January 23, 2015 (which

1

resulted in his placement in segregation) in violation of the First, Eighth, and Fourteenth Amendments. (Doc. 28). He has further alleged that this incident puts his life in danger and that he must be transferred out of Pickneyville Correctional Center, where he is currently incarcerated, to Dixon Correctional Center. (Doc. 22). Since filing the Complaint, Plaintiff has made numerous requests for injunctive relief, including his "Motion to Notify/Disposition," (Doc. 40); a "Signed Emergency Motion for TRO, Preliminary Injunction" (Doc. 56); "Motion/Emergency Notice Retaliation/Imminent Danger" (Doc. 120); as well as several "notices"[1] further explaining why Plaintiff is in imminent danger. This matter has been referred pursuant to 28 U.S.C. 636(b)(1)(B) to the undersigned for an evidentiary hearing. An evidentiary hearing was held on October 7, 2015 and eventually continued until November 12, 2015 regarding Plaintiff's Motions. Plaintiff appeared pro se. Eric Bulman represented Defendants at the October 7, 2015 hearing, and Matthew O'Malley appeared for Defendants at the November 12, 2015 hearing. Plaintiff called Juan Rosario, William Malone, Charles Davidson, Tavaris Johnson, and Devon Stewart. Defendants called Sean Furlow, who appeared at both the October 7 and November 12 hearing.

### Factual Background

Plaintiff testified at the October 7, 2015 hearing that he had already been attacked twice as a result of being labeled a snitch. He testified that he went to internal affairs ("IA") on January 23, 2015. (Doc. 128, p. 19). On his way back he was slapped in the back of the head by an unseen assailant. (Doc. 128, p. 19-21). His cellmate, Bankhead then "attacked" him the next day, calling him a "snitch ass bitch." (Doc. 128, p. 19, 22). Plaintiff later clarified that Bankhead pushed his finger in his face, but did not actually hit or strike him. (Doc. 128, p. 22-23). Plaintiff also claims that he then took it upon himself to be placed in segregation for safety purposes. (Doc. 128, p. 22-23). Although Plaintiff's Amended Complaint repeats this claim, it also states that Defendants wrote

---

[1] The undersigned notes that neither "Motions to Notify" nor notices are permitted under the Rules of Federal Procedure and that they are not favored in this Court.

a false disciplinary report against Plaintiff, causing him to be placed in segregation.  (Doc. 22, p. 34-35) (Doc. 22-2, p. 5).

Plaintiff testified that an inmate whose name he cannot remember told him on approximately January 28, 2015 that "they are going to get you."  (Doc. 128, p. 25).  Plaintiff also heard some guys on their way to a ticket hearing say that there's a "snitch bitch" right here and that they were going to "get" him when he got out of segregation.  (Doc. 128, p. 28).  Plaintiff did not see the inmates making those statements.  (Doc. 128, p. 28).  Plaintiff then refused to provide more information about the inmates making these threats because he feared for his safety.  (Doc. 128, p. 29-30).

Plaintiff's "Motion to Notify/Disposition," filed on April 23, 2015, identifies Melvin Bankhead and Abdul Robinson, otherwise known as "Psycho," as inmates who pose a threat to him.  (Doc. 40).  Plaintiff also testified that he gave Assistant Warden Spiller a letter with a specific list of names of people that have been threatening him.   (Doc. 128, p. 31).   The list included Larry Hampton, Marvin Jeter, Abdul Robinson, Melvin Bankhead, and Patrick Tayler.  (Doc. 128, p. 32).  Upon questioning from the Court, Plaintiff refused to provide an account of specific occasions of when he was threated because he had gotten too many threats to accurately recall.  (Doc. 128, p. 35).  Plaintiff estimated that while he was in segregation, he would receive threats once to twice a week.  (Doc. 128, p. 36).  None of the threats state a certain time and place for an attack.  (Doc. 128, p. 49).

Although Plaintiff refused to testify about specific dates and times at the October 7 hearing, Plaintiff's next motion seeking injunctive relief contains a letter dated May 2015 that Plaintiff describes as a threat on his life.   (Doc. 56).  The letter states that the writer was in Lawrence with Plaintiff, that he heard Plaintiff had "snitched on some shit" and some people were out to get him.  (Doc. 54, p. 4).  The letter goes on to state that the letter writer has problems of his own and he heard that Plaintiff was "hooked up with as a shot-caller."  (Doc. 54, p. 4).  The letter writer goes on

3

to ask for a "call for peace if there is any beef with us." (Doc. 54, p. 4). It states that the letter writer will not "get" Plaintiff if asked, and requests that Plaintiff do him the same favor. (Doc. 54, p. 4). It also tells Plaintiff to report everything and follow the proper procedures. (Doc. 54, p. 4).

Plaintiff testified at the October 2015 hearing that he turned over the letter right away, and that a lieutenant told him that his problems with Merritte, the author of the letter, were over. (Doc. 128, p. 48). Plaintiff was also informed that Merritte had been moved. (Doc. 128, p. 48). Plaintiff initially testified that he could not recall if anyone from IA had interviewed him about the letter, (Doc. 128, p. 47). He then testified that upon receiving the letter, he turned it over to the officers, who gave it to the major, and the major came to speak to him that day. (Doc. 128, p. 48). While internal affairs did not conduct an investigation into the Merritte letter, they inquired into it and issued a disciplinary report dated June 5, 2015 against Merritte. (Doc. 119, p. 75) (Doc. 128, p. 57). Merritte was also placed on Plaintiff's KSF list. (Doc. 128, p. 57).

Internal Affairs also attempted to transfer Plaintiff out of Pickneyville as a result of the Merritte incident, but the transfer was denied by the transfer coordinator. (Doc. 119, p. 75-76). Typically, a facility will attempt to transfer both the individual who made the threat and the individual who received the threat, but here Plaintiff was denied transfer. (Doc. 119, p. 97). Lt. Furlow, the internal affairs supervisor at Pickneyville Correctional Center, Doc. 128, p. 56, testified that Pickneyville recommended the transfer and it was denied by the statewide transfer coordinator. (Doc. 119, p. 98-101). In addition to the incident with Merritte, Furlow had also cited Plaintiff's multiple disciplinary reports at Pickneyville, as well as his allegation of staff sexual assault, as other reasons to transfer Plaintiff. (Doc. 119, p. 101). An email chain from the transfer coordinator indicates that the transfer coordinator took Plaintiff's status as an ADA inmate, his categorization as a medium security inmate, and his history of starting incidents at institutions into account. (Doc. 119, p. 100-101). Specifically, the transfer coordinator noted that "he has a pattern of getting

involved in things and then can't remain at places. We're going to run out of options eventually." (Doc. 119, p. 101). After recommending the transfer, the situation was out of Furlow's hands, other than to provide further information to the transfer coordinator. (Doc. 119, p. 101). Furlow also stated that if he referred an inmate to the transfer coordinator without a substantiated threat, the transfer coordinator would refuse to consider the request at all. (Doc. 119, p. 105). Furlow also stated that if they transferred all inmates who made unsubstantiated claims, they would have three or four buses leaving Pickneyville every day. (Doc. 119, p. 105).

At the first hearing, Plaintiff claimed that he had affidavits from prisoners who had allegedly witnessed other inmates making threats to him based on the guard's comments. (Doc. 128, p. 7). After reviewing the docket and exhibits attached to some of Plaintiff's proposed amended complaint, the Court was able to identify one affidavit. (Doc. 128, p. 16). That affidavit was submitted as an exhibit to a proposed amended complaint and never filed. The affidavit purports to be from a "Wayne Jones," although it is signed by "Donald Carlyle." (Doc. 128, p. 16-17). The affidavit states that the affiant is bound by "confidentiality restrictions," but states that unknown inmates would holler threats at Plaintiff every time they walked past his cell and call him a snitch. (Doc. 128, p. 16). There are also other affidavits in the record from Carlyle testifying to other matters that were in Plaintiff's complaint prior to dismissal upon threshold review; for example, Carlyle provided Plaintiff with an affidavit testifying that Plaintiff's eye glasses prescription was wrong. (Doc. 22-2, p. 10).

Plaintiff claimed that he had submitted other affidavits from other prisoners. (Doc. 128, p. 14). However, the Court could not locate those affidavits in the record, and so continued the hearing so that Plaintiff's witnesses could be called to testify. During the hearing, the Court made substantial effort to identify all of the relevant witnesses. (Doc. 128, p. 11-12, 15, 17-18). Although Plaintiff confirmed the Court's witness list at the hearing, later he moved to call other witnesses,

including A. Rogers, Robinson, Skibbe, Damarco Watts, Sr., Larry Perkins, Robert Bostic, and Alexander Porter, which the Court denied.  (Doc. 112)

Plaintiff got out of segregation on September 3, 2015.  (Doc. 128, p. 36).  Rosario and Johnson heard other people making threats about Plaintiff and reported those threats to him.  (Doc. 128, p. 36-37).  Upon hearing their report, Plaintiff started paying for protection.  (Doc. 128, p. 37).  Plaintiff refused to tell the Court who is protecting him.  (Doc. 128, p. 39).  Plaintiff also reported hearing threats himself, but could not provide the names of any of the inmates making the threats.  (Doc. 128, p. 37).  Later at the hearing, Plaintiff inconsistently stated that he had not heard the threats himself, but that other people had told him he was being threatened.  (Doc. 128, p. 46).

Plaintiff testified at his October 7, 2015 hearing that his current cellmate, Acosta had been causing problems, and Plaintiff believes those problems could be a result of Acosta hearing that Plaintiff is a "snitch." (Doc. 128, p. 40-41).  Plaintiff's later filed another motion that describes the "problems" as Acosta impeding both him and his other wheelchair-bound cellmate as they both moved around the cell.  (Doc. 110).  On October 22, 2015, Acosta started making verbal threats to Plaintiff and then put his feet in Plaintiff's face.  (Doc. 110, p. 2).  Acosta then threw Plaintiff's wheelchair on top of him.  (Doc. 110, p. 2).  Plaintiff responded by grabbing at Acosta and ripping his shirt.  (Doc. 110, p. 2).  Both inmates were then taken to segregation for fighting, although Plaintiff claims that his move to segregation was "wrongful," and possibly orchestrated to keep him away from the John Howard Association.  (Doc. 110, p. 2).

Plaintiff later filed a supplemental pleading which he asked the Court to consider and which Plaintiff contends shows that he reported many of Acosta's threats to staff, which went ignored.  (Doc. 111).  In the exhibits attached to that filing, Plaintiff did not report threats based on his alleged status as a snitch.  (Doc. 111, p. 6-7).  Rather, Plaintiff complained that the cell was too small and that the cellmates where coming into conflict because they did not have sufficient space.  (Doc.

6

111, p. 6-7, 11-12).   Plaintiff's October 21, 2015 grievance notes that he does not like Acosta, and that a fight will likely happen if Acosta is not moved, but does not contain any of Plaintiff's other allegations that Acosta does not like Plaintiff because he has been branded a snitch.  (Doc. 111, p. 14-15).  The word "snitch" is not used at all.  (Doc. 111, p. 6-7).  Plaintiff's other exhibit addresses his complaints about the toilet facilities on the yard.  (Doc. 111, p. 8-10).   Plaintiff is currently housed away from Acosta because the facility has placed Acosta on Plaintiff's KSF list as a result of the fight.  (Doc. 124-1).

Plaintiff specifically testified that if he told the Court "everything" he would be a snitch. (Doc. 128, p. 41).  He also contends that he is considered a "snitch" throughout the entire prison. (Doc. 128, p. 41-42).  Plaintiff also testified that he has sent six letters and grievances to Deputy Director Hardy on this issue, and also given a list of enemies to the assistant warden.  (Doc. 128, p. 39).  He also wrote a complaint to Lt. Furlow.  (Doc. 128, p. 45-46).

Plaintiff's witnesses were called at the November 12, 2015 hearing.  Plaintiff's first witness, Juan Rosario, testified that he heard people "talking stuff" about Plaintiff every day.  (Doc. 119, p. 5).  Rosario refused to identify any of the people he heard calling Plaintiff a snitch because he did not want to get into trouble.  (Doc. 119, p. 6).  Rosario believed that Plaintiff was called a snitch because he was frequently called out for things.  (Doc. 119, p. 8).  He could not recall dates or times when he heard the comments.  (Doc. 119, p. 7).  He refused to testify regarding any of the "things" Plaintiff was called out for on the grounds that it would imperil his safety.   (Doc. 119, p. 10). Rosario also testified that he heard Plaintiff's cell mate call him a snitch and that they frequently argued.  (Doc. 119, p. 6).  Rosario also heard Plaintiff fighting with his cellmate.  (Doc. 119, p. 7).

Plaintiff next witness, William Malone, testified that other prisoners would believe an inmate was a snitch if they heard a guard instruct a prisoner to report to IA or operations, regardless of whether the inmate is going to talk about a state worker.  (Doc. 119, p. 19-21).  It is rare for an

inmate to be called to IA, so when it happens, people take note.  (Doc. 119, p. 29).  Malone knows of at least 20 other inmates who are in Plaintiff's situation.  (Doc. 119, p. 30).  Malone never heard anyone threaten Plaintiff or say that they were going to "get" him, although he speculated that Plaintiff may get called names on his current cell block.  (Doc. 119, p. 20, 39).  Plaintiff has a reputation as an outspoken inmate.  (Doc. 119, p. 20).  Malone has heard Plaintiff called a rapist.  (Doc. 118, p. 21).  Malone has also heard Plaintiff called a snitch, but he declined to identify who called Plaintiff a snitch out of safety concerns.  (Doc. 119, p. 26).  Plaintiff also objected to Malone disclosing that information.  (Doc. 119, p. 26).  Malone testified that Lt. Furlow is the only one who makes effort to see that prisoners are not being abused.  (Doc. 119, p. 24).  He further characterized Furlow as a "good CO."  (Doc. 119, p. 42).

Plaintiff then called Charles Davidson to the stand.  (Doc. 119, p. 46).  However, Davidson insisted that he had no useful knowledge and did not wish to testify.  (Doc. 119, p. 46).  Plaintiff had also named Donald Carlyle, but he had transferred out and was unavailable to testify.  (Doc. 119, p. 47).

Plaintiff then called Tavaris Johnson.  (Doc. 119, p. 48).  Johnson testified that while he was in segregation with Plaintiff he heard twice-weekly comments that Plaintiff was a rapist.  (Doc. 119, p. 49).  He also heard several people, including correctional officers label Plaintiff a snitch.  (Doc. 119, p. 49).  Being labeled a "snitch" in prison exposes a prisoner to a risk of fights and bodily harm.  (Doc. 118, p. 49).  Johnson is currently located in general population, where he occasionally still hears Plaintiff being talked about as a snitch, although not as often as he did in segregation.  (Doc. 119, p. 50-51).   Being labeled a snitch is something that follows a prisoner throughout the entire institution.  (Doc. 119, p. 52).  Johnson has never heard anyone say that they were going to "get" Plaintiff or anything like that; he only heard others label Plaintiff a snitch.  (Doc. 119, p. 55).

Specifically, CO Maurer called Plaintiff a snitch.  (Doc. 119, p. 56).  Johnson has never witnessed Plaintiff suffer great bodily harm.  (Doc. 119, p. 56).

Plaintiff's last witness was Devon Stewart.  (Doc. 119, p. 62).  At one time, Stewart was housed directly across from Plaintiff.  (Doc. 119, p. 63).  Stewart often heard Plaintiff called a snitch and a rapist while housed with him, and he still hears those comments where he is currently celled, in one house.  (Doc. 119, p. 63).  Stewart also refused to name names of people who may have called Plaintiff a snitch out of safety concerns.  (Doc. 119, p. 70).  Stewart also told the Court of an incident in Cook County Jail in 2009 when Plaintiff was hit with spool balls for allegedly being called a snitch.  (Doc. 119, p. 73).

Plaintiff's KSF list currently includes Steven Hughes, Joel Mayoral, Larry Hampton, the entire facility of Centralia, Willie D. Witherspoon, Earl E. Ratliff, Marvin Jeter, Timothy Cunningham, Calvin Merritte, Larry Reese, and Daniel Acosta.  (Doc. 128, p. 58).  Larry Hampton, Terry Beasley, Joseph Herman, and Larry Reese have also declared Plaintiff an enemy and put him on their KSF lists.  (Doc. 128, pp. 58-59).  IA will automatically add inmates to a KSF list in the event of a fight or assault, but otherwise an inmate has to provide IA with the name and number of the offender and permit IA to interview the object of the request.  (Doc. 119, p. 76) (Doc. 128, p. 59).  The forms to add an inmate to a KSF list require the requesting individual to specify 1) whether he was incarcerated with the individual; 2) whether he had been in an altercation with the individual before; 3) why and who are you claiming as an enemy; 4) whether internal affairs may interview the individual.  (Doc. 128, p. 67).  IA must be able to substantiate what an inmate is alleging.  (Doc. 128, p. 59).  If IA is not permitted to interview the target of a KSF investigation, the allegation is automatically not substantiated.  (Doc. 128, p. 67).  The form also warns inmates that disciplinary action will be taken if false information is provided.  (Doc. 128, p. 67).  If the threat is not substantiated, IA will not add an inmate to the KSF list.  (Doc. 119, p. 76).

Lt. Furlow is aware that Plaintiff has alleged that he was branded a snitch after coming into the IA office to substantiate an unrelated claim against staff that he had made. (Doc. 128, p. 60-61). Plaintiff chose inmates for IA to interview over this assertion, and IA interviewed those inmates. (Doc. 128, p. 60). IA could not substantiate Plaintiff's claims, and the inmates that they interviewed had not heard any threats made. (Doc. 128, p. 61).

Furlow has letters from Plaintiff that were forwarded to his office by others. (Doc. 128, p. 61-62). He received a letter dated May 2015 that was sent to the East St. Louis United States District Court. (Doc. 128, p. 61-62) He received a letters to assistant warden Norman dated May 9, 2015 and June 3, 2015. (Doc. 128, p. 62). He was also forwarded a letter to the Warden dated July 13, 2015. (Doc. 128, p. 62). As a result the allegations that Plaintiff was being called a snitch, Furlow interviewed James Sims, Azel Curry, Alvin Sanders, Aaron Smith, and Jonathan Parker on April 18, 2015. (Doc. 128, p. 62, 64). Plaintiff gave Furlow these names. (Doc. 128, p. 69). Furlow inquired into Plaintiff's request to put Melvin Bankhead on his KSF list, but the allegations were not substantiated because Plaintiff did not specifically request that internal affairs interview him. (Doc. 128, p. 68, 70). Furlow was not aware of any other inmates that Plaintiff had tried to add to his KSF list. (Doc. 128, p. 70). He specifically did not recall Plaintiff ever asking to add Abdul Robinson to his KSF list. (Doc. 128, p. 71). In between the first hearing and the second hearing, Daniel Acosta was added to Plaintiff's KSF list because he and Plaintiff got into a fight. (Doc. 119, p. 78). Furlow noted that Plaintiff had been charged with assault by IA in April or May of 2015. (Doc. 119, p. 78-78). He was also issued a ticket for the October 2015 fight with Acosta by IA. (Doc. 119, p. 86-87).

Furlow also testified that it is common for inmates to state that they have been branded a snitch. (Doc. 119, p. 77). The word "snitch" is thrown around the facility frequently and applied to both staff and inmates. (Doc. 119, p. 95). Many of those claims are never substantiated by IA

10

because the inmate is unwilling or unable to provide names or faces to IA.  (Doc. 119, p. 77).  If an inmate was branded a snitch for coming over to the IA, Furlow would not enter a KSF because to him, that does not rise above the level of general name calling, which happens all the time.  (Doc. 119, p. 93, 96).  An allegation that an inmate was angry because he believed that another inmate was snitching on him specifically would be more credible.  (Doc. 119, p. 94).   Likewise, an allegation that a specific group of inmates pose a threat to another inmate's safety would be for IA to investigate.  (Doc. 119, p. 96). In Furlow's experience, the snitches that usually pose a safety or security risk to the facility are those individuals who gave up gang information or information on the street that caused an individual to get locked up.  (Doc. 119, p. 96-97).  Furlow believes that it is difficult to substantiate a blanket allegation that an inmate has been branded a snitch because he came to the IA office one time.  (Doc. 119, p. 94).  Furlow testified that he had interviewed 10-12 inmates that day for various matters and he thought it unlikely that they would all be labeled as snitches.  (Doc. 119, p. 94).

Furlow also testified that he has never heard a specific inmate or anyone label Plaintiff a snitch.  (Doc. 119, p. 95).  Plaintiff has a reputation as a jailhouse lawyer, and Furlow believes that is what most inmates would report about Plaintiff.  (Doc. 119, p. 95).

Plaintiff filed another document on December 22, 2015 indicating that he was experiencing problems with his current cellmates, Beatty and Woodard.  (Doc. 126).  The filing also indicated that this was because they thought Plaintiff was a snitch.  (Doc. 126).

## Analysis

The purpose of a preliminary injunction is to preserve the status quo until the merits of a case may be resolved. *Indiana Civ. Liberties Union v. O'Bannon*, 259 F.3d 766, 770 (7th Cir. 2001).  *Accord Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("the purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits

can be held.").  A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). *Accord Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right."); *Girl Scouts of Manitou Cnty., Inc. v. Girl Scouts of USA, Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008) ("[A] preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.") (internal quotation marks omitted).

To secure a preliminary injunction, a movant must show (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without the injunction, (3) the harm he would suffer is greater than the harm that the preliminary injunction would inflict on the defendants, and (4) the injunction is in the public interest. *Judge v. Quinn,* 612 F.3d 537, 546 (7th Cir. 2010) (citing *Winter*, 555 U.S. at 20). The considerations are interdependent: the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted. *Judge,* 612 F.3d at 546.  Mere speculation will not be sufficient to support a preliminary injunction. *Baird v. Hodge*, 605 F. App'x 568, 570 (7th Cir. 2015) (denying a former police officer's request for a preliminary injunction ordering protective custody on the grounds that the Plaintiff had only shown one inmate who is a threat to him and that harm from any other inmate was speculative).

In general, the undersigned finds Plaintiff not credible.  Plaintiff originally filed this suit with almost twenty separate claims, most of which were dismissed out on threshold.  (Doc. 22).  Almost all of the original claims requested that Plaintiff be transferred to Dixon Correctional Center, the same request Plaintiff makes here.  Plaintiff's Amended Complaint alleges, among other things, that Plaintiff should be transferred to Dixon due to ADA violations, impermissible soy diet, inadequate

treatment of his diabetes, etc.  (Doc. 22).  It is clear that Plaintiff is prepared to say whatever necessary to secure a transfer to Dixon Correctional Center.

Plaintiff also testified in open court that his former cellmate, Acosta, attacked him because Acosta had heard that Plaintiff was a snitch, yet this allegation is nowhere in any of the grievances that Plaintiff submitted as an exhibit to pleadings he filed regarding that allegation.  Instead, those grievances state that Plaintiff dislikes Acosta.  They even contain what might be construed as a threat, because Plaintiff stated that a fight would happen if Acosta is not moved.  This grievance was written one day before Acosta and Plaintiff got into a fight.  Plaintiff also stated in a pleading that his fight with Acosta started because he yelled at Acosta for having his feet in Plaintiff's face.  This belies Plaintiff's later claim that he lived in fear of Acosta because Acosta believed Plaintiff was a snitch.  Those grievances also contain responses from the grievance officer and the counselor, which contradict Plaintiff's claims that no one ever responded to his grievances.

Plaintiff also submitted an affidavit that purported to be from one inmate but was signed by another inmate.  The inference there is that the affidavit was prepared first and a signatory sought out later.  Plaintiff also attempted to testify that he had filed many affidavits about other inmates hearing threats, but the Court was only able to discover one.

Plaintiff has also stated throughout this litigation that his problems with being called a snitch started when Eber and Hellman called him a snitch in January 2015.  However, Merritte's kite to Plaintiff states that Plaintiff had a reputation as a snitch at Lawrence, and one of Plaintiff's witnesses testified that Plaintiff had previously been labeled a snitch while incarcerated at Cook County Jail.  Additionally, many of Plaintiff's witnesses testified that the problematic act was going to IA, not being yelled at by Eber and Hellman.  These inconsistencies again suggest that Plaintiff is attempting to milk this incident to secure a transfer.  The undersigned also notes that Plaintiff sent the Court a

Christmas card, which the undersigned views as an attempt to improperly influence the Report and Recommendation as it specifically stated that Plaintiff expected a report in his favor.

Plaintiff's credibility goes to the issue of whether Plaintiff is actually at risk for irreparable harm if the injunction is not granted. The Seventh Circuit stated in *Baird* that mere speculation is not enough to grant an injunction. There the inmate—a former cop—dealt with the exact kind of generalized reputation issues that Plaintiff complains of here, if not worse. ***Baird*, 605 F. App'x 568**. Yet the Seventh Circuit said it was not sufficient for Baird to speculate that he was in danger because of his generalized reputation as a former police officer. ***Id.* at 570**. The Seventh Circuit came to that conclusion that Baird did not deserve protective custody or a transfer, despite the fact that he had previously been punched, choked and hit with a plastic stool—conduct far more dangerous than what Plaintiff complains of here. *Id.* Here, Plaintiff has done nothing more than speculate that his reputation as a snitch puts him in danger of serious harm. Given his credibility issues, this is hardly sufficient to form the basis of issuing a preliminary injunction. The only specific threats that Plaintiff has informed the Court of have been addressed by the prison and those inmates transferred away from Plaintiff and added to his keep separate from list. All of those past threats involved nothing more serious than slapping; none showed evidence that Plaintiff was in serious danger of irreparable harm. Plaintiff refused to testify about any other specific threats he is currently facing. Plaintiff's testimony is therefore insufficient to establish that he is in danger of irreparable harm because it never rises beyond the level of speculation as to the current threat that Plaintiff faces. Plaintiff also has not presented any evidence that he has actually suffered from irreparable harm.

Plaintiff also submitted witness testimony to establish his risk of harm, but the undersigned finds that testimony insufficient as well. First, there are credibility problems with Plaintiff's witnesses as well. Plaintiff coached his witnesses during their testimony and frequently asked leading

questions and attempted to put answers in his witnesses' mouths. Plaintiff's witnesses also contradicted each other. Rosario testified that he heard Plaintiff called a snitch every day, while other witnesses testified that they heard Plaintiff called a snitch several times a week or only sometimes. Contrary to Plaintiff's claims, Malone and Johnson specifically denied ever hearing anyone threaten to get Plaintiff. In fact, while Plaintiff's witnesses gave testimony that they heard him being called names like "snitch" and "rapist," none of them testified that they heard threats to his safety. This is consistent with Furlow's testimony that many inmates are called "snitch" simply as a form of name calling. Each and every one of Plaintiff's witnesses refused to specifically identify those they heard calling a Plaintiff a snitch, and Plaintiff on more than one occasion attempted to stop them when he thought that they might be about to. Therefore, any attempts to conclude that Plaintiff is at risk of irreparable harm from Plaintiff's witnesses' testimony rests solely on speculation and is insufficient pursuant to *Baird*.

Furlow also contradicted the testimony submitted by Plaintiff and his witnesses that the type of harassment Plaintiff recounts represents an actual threat to his safety. Furlow testified that inmates engage in generalized name-calling all the time and that "snitch" is part of that generalized name calling. This is consistent with Plaintiff's witnesses' testimony that they also heard Plaintiff called a "rapist" but did not hear specific threats to "get" Plaintiff. Plaintiff concedes in his pleadings that he went to IA in January 2015 to report on what he considers a staff sexual assault, and not to report another inmate. In fact, his allegation is that the Defendants specifically stated that Plaintiff had gone to snitch on staff. This is not the kind of snitching that, in Furlow's experience, creates a risk of great bodily harm. Plaintiff's report on that date would not have interfered with any of his fellow inmate's activities, and it certainly would not have caused a person on the street trouble with the law. Plaintiff's situation, objectively speaking, is not one that would

place him at serious risk of irreparable harm.  Therefore the Court should deny Plaintiff's request for injunctive relief.

There is also ample evidence that Plaintiff is unlikely to succeed on the merits of his claim. The undersigned found Furlow's testimony very convincing.  Furlow testified that threats must be substantiated before action may be taken.  He testified that IA has taken action on Plaintiff's two substantiated threats by placing inmates Acosta and Merritte on Plaintiff's KSF list and by moving both of them away from Plaintiff.  Furlow also testified, critically, that he had recommended Plaintiff for a transfer but that it had been denied by the transfer coordinator, who does not work for Pickneyville and is not a party here.  Furlow also testified that he attempted to substantiate Plaintiff's claims of generalized threats, but none of Plaintiff's witnesses corroborated his story.  He also testified that a transfer coordinator would reject a request where the threats had not been substantiated.  While Plaintiff frequently attempted to malign Furlow by suggesting that Furlow had not adequately addressed threats that Plaintiff had complained about to other prison staff, there was no testimony that Plaintiff brought those threats to Furlow's attention or followed the proper procedure.  None of Plaintiff's other threats have been substantiated.  No one can be accused of being deliberately indifferent to a serious risk of harm on these facts because it is clear that IA investigated all of Plaintiff's claims to the best of their ability and requested Plaintiff's transfer.

The undersigned **RECOMMENDS** that the District Court **DENY** Plaintiff's Motions for a preliminary injunction. (Doc. 40) (Doc. 56) (Doc. 120).  To the extent that any other of Plaintiff's filings, some of which do not comply with the Federal Rules of Civil Procedure, contain requests for injunctive relief, the undersigned **RECOMMENDS** that the District Judge **DENY** those requests as well.  Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 73.1(b), the parties may object to any or all of the proposed dispositive findings in this Recommendation.  The failure to file a timely objection may result in the waiver of the right to challenge this Recommendation before either the

District Court or the Court of Appeals. ***See, e.g., Snyder v. Nolen***, **380 F.3d 279, 284 (7th Cir. 2004).  Objections to this Report and Recommendation must be filed on or before February 8, 2016**.  ***See*** **Fed. R. Civ. P. 6(d); SDIL-LR 5.1(c).**

**IT IS SO RECOMMENDED.**

**DATE: January 21, 2016**                              **/s/ *Stephen C. Williams***
                                                                              **STEPHEN C. WILLIAMS**
                                                                              United States Magistrate Judge